v. Roberts. May it please the Court, I am Fred Bronstein from the Robbins-Kaplan Law Firm for Appellant Curtis James Jackson III, otherwise known as the Artist 50 Cent. At issue in this case is a unique and somewhat limited instance where Mr. Roberts chose to explicitly advertise his forthcoming album in a free song distributed over the Internet. It's undisputed that Mr. Roberts used Mr. Jackson's name and about 30 seconds of his voice without permission from anyone for that promotion. And repeatedly in that promotional song, Mr. Roberts tells the listener to buy his album Black Market, which goes on sale December 4th. Generally advertisers pay significant amounts of money to Mr. Jackson to use his persona in their ads. However, in this case, Mr. Roberts did not pay a dime to use Mr. Jackson's identity to promote his commercial album. In fact, even though he readily acknowledges that there is a standard licensing process through which he could have gone to seek permission, he didn't do that. He didn't seek permission from anyone. Such conduct, as the district court correctly indicated, is a violation of Mr. Jackson's right to control the commercial use of his identity. In the case of the upcoming album, it was just like, it was just a remix. In that case, that preemption would be appropriate. Correct. We would not have brought this case had those lyrics been excluded. And in fact, yes, correct. So it's just the focus on the upcoming album and the references that you say are promoting Mr. Jackson's, I mean, Mr. Roberts' upcoming album that turned this into a case. Correct. We're not challenging generally the ability of artists to take a song and sample from it and make a new creative work. We're just saying in this unique instance where Mr. Roberts decided to combine a remix song with an expressly commercial message, that that's where he has crossed the line. Your adversaries try to suggest that because your client had contractually surrendered any right to his identity or voice in connection with the Indy Club, that he's not the party who can bring this action. You want to tell us why you don't think that argument should trouble us? Sure. I'd like to address that specifically because it's an error of fact that I believe the district court got wrong. The district court specifically focused on Section 8.01 of the recording contract and specifically on a provision that was no longer operable at the time of Mr. Roberts in 2015. Contract had expired and it was no longer an exclusive. Correct. So as of the date of the release of the promotional song, there's only two relevant provisions of that contract that are operable. The first is Section 8.01A, which is a grant from Mr. Jackson to the record label of a non-exclusive right to market his records that were recorded pursuant to that recording agreement. So if the label wanted to market Mr. Jackson's Get Rich or Die Trying, which is the album Inda Club is from, it could use his name to do so. And one more time on that provision, please. That is Section 8.01A. Thank you. The district court, in finding that Mr. Jackson had waived or otherwise gotten rid of this right, focused on 8.01B, which is the counterparts to that, which is that Mr. Jackson agreed that during the term of the agreement, he would not use his name and likeness to advertise other phonographic records, that he wouldn't do that. Only the record label could do that. There was no such restriction in 2015 in the time period in question. The only other provision that's relevant to this analysis is Section 8.03E. And that provision is a restriction on the rights of the record label as a copyright holder. So these are additional restrictions that the record label itself had agreed to impose. Among other restrictions, Mr. Jackson's label agreed that it would not license master recordings, including the song at issue, Inda Club, for use as a sample without Mr. Jackson's consent. So this is an express reservation of the right in question. And that's exactly what Mr. Roberts did here. He sampled Inda Club in the remix. So for that reason, I think it's self-evident that those contract provisions do not bar a claim here. And so they certainly don't waive or surrender it. Roberts. Insofar as the question whether Jackson had surrendered contractually the right to control the use of his name, the district court made two errors, both it misread the contract because he hadn't surrendered, or rather if he had surrendered it prior to the expiration of the contract, it returned to him after the contract expired in 2015. But furthermore, that has no bearing on Section 301 field preemption. Isn't that correct? The district court somehow drew the inference that its conclusion about the surrender by Jackson of the name somehow justified the imposition of field preemption on Jackson with respect to the use of his name. And these are apples and oranges. The one has nothing to do with the other. That's absolutely correct, Your Honor. Our position here is that essentially we agree the record label owns the copyright. But at issue here is Mr. Jackson's right of publicity. He certainly hasn't assigned that to anyone else. It's still his. And the use of the question whether one is entitled to use the name in publicizing anything is not something, is not an issue granted by, is not a remedy granted by the copyright law. Correct. And it's a particularly significant use of Mr. Jackson's name here. The listener goes online, sees the song in the club featuring 50 Cent, promising a featured performance by my client. And within the first 10 seconds of the song, hears repeatedly, only on the black market, December 4th, the album is out. Only on the black market, December 4th, the album is out. That's repeated six times throughout the song. There are two separate types of usage that the plaintiff is complaining about. One is the use of his name, where the label said something about Jackson and the identification of the song in print. And the other was the sampling and the copying by the defendant of the words. Now with respect to the use of the sampling and the use of the copying by the defendant of the plaintiff's work, that seeks to prevent a performance. So would you explain why that should not be, why should that not be preempted by Section 301's field preemption? Absolutely. There's a number of circuit courts that have addressed this specific question. Each such court has considered, has held that in an instance where the challenge use is in an advertisement as opposed to just creating another entertainment work, the subject of such a claim is not the copyrighted work itself, say the song. It's actually Mr. Jackson's persona. The use of his persona as embodied in that song is what he's challenging. So do you agree with that? So you should agree with that because otherwise there's no limiting principle whatsoever left in terms of a right of publicity. I'll give you an example to illustrate. If I take your photograph, I could be the copyright holder to that photograph and can use it in a manner that I see fit. The same is true for a video or a sound recording. But what I cannot do as the holder of that is put an advertisement for Coca-Cola and print that in a magazine. That would be a violation of your right of publicity. This court has recognized that there's a separate property right in one's ability to control the commercial use of their identity. Even if the mixtape can be classed as an advertisement, it doesn't necessarily follow that the use of the plaintiff's voice at some point in that advertisement somehow implies that the plaintiff is endorsing what the mixtape is promoting. That's absolutely correct. But the claim here is not for false endorsement. It's for commercial use of identity, and there's no false endorsement component as an element. And that's a distinction this Court made in the Rogers case when it was talking about the right of publicity. More significantly, why there shouldn't be a false endorsement prong there is that any advertiser at that point could take this song and separately say, buy Coca-Cola, say a couple other things, and then play Mr. Jackson's song on a radio ad. That is a advertisement invoking Mr. Jackson's right of publicity. And that's how celebrities presently make money in the endorsement context. They get to control when an advertisement uses their identity or not. So that's regardless if it's an endorsement or not. Would this be the same case if instead of putting the lyrics saying, the album's coming out in a few weeks, on the remix itself, it had just appeared in a caption? If you go on the internet, you can find the remix tape, listen to it. And then there is also, my album's coming out next month. I don't believe it would be, it's certainly not as strong of a case. I will say, those facts are also- Wouldn't that still be advertising, I mean, as you're defining it? Depending on the specific facts, it could be here, for example, the album cover actually says, Black Market, December 4th. That image is embedded in the file, so when you download it, if you have a certain type of media player on your computer, you actually see an image that's an advertisement for the album. And then you hear the song. I don't think this court needs to address that case to hold that here, this explicit lyrics, only on the Black Market, December 4th, the album is out, is an advertisement. Yeah, I noticed you cited from the restatement, Third of Unfair Competition in your brief, and it refers to some incidental uses of the advertising as not counting. And I was just wondering what those were, and if we were to accept your argument, how we would distinguish those. Sure, so there is a critical point here, and it's from the restatement from that section, which is, an incidental advertisement would be if, actually in this case, if someone had the copyright to Indy Club and wanted to sell Indy Club, they could sample from that song that's related to the copyright. That wouldn't be a violation of Mr. Jackson's right of publicity. Here, had Mr. Roberts on Black Market had a song about Mr. Jackson and talked extensively about him and even sampled his voice, they could make an advertisement using that song. That would be selling that work. Here, what the promotional song at issue is, it's an advertisement for a collateral product. The product is not this promotional song. The product is something else. It's completely unrelated to Black Market. And that's the distinction between generally selling an entertainment work versus using an entertainment work to sell a collateral product. If the copyright holder of Jackson's song was licensed, this use by Roberts, would Jackson have the claim that he's raising here? If, yes, he would have a contract claim against the record label for doing it without his consent. And I'm assuming in your hypothetical there would have been no consent. He would also. I'm saying that supposing that the copyright holder, that the copyright holder doing nothing improper, doing only things within its rights as the copyright holder, had licensed for money Roberts to use a sampling in his mixtape. And Jackson sues and says, you're using my voice, which people recognize as me. People recognize my voice in your mixtape. You're using that. You're using my identity for your personal benefit. A suit against Roberts, not against the copyright holder. Is the mixtape the exact same mixtape in the record, meaning it has the commercial lyrics as well as just generally entertainment? In that case, yes, he would have a right of publicity claim. Unless the record label had been able to convey some sort of publicity license, the contract allows the record label to convey the name and likeness in connection with Mr. Jackson's songs. That was the 8.01a. More generally, what would happen in that typical case, and you have evidence of this in the record, is if someone wants to sample a song, Mr. Jackson's consent is sought as part of that licensing process. So that's CA 541 to 542. You have an email of specifically your example. It was a different artist asked permission to use a portion of Indy Club. What happened was the record label forwarded that request to Mr. Jackson to get his consent. He said yes. The record label conveyed the license. And there was no problem, because they had both consent from the publicity right holder and the copyright holder. All our position, our position in this case is Mr. Roberts should have gone through that process. And by not doing that, he violated Mr. Jackson's right of publicity. Thank you. May it please the court. Court's indulgence. My name is Jonathan Goins. I'm here with my partner, LaRon Rogers, with Lewis-Brisbois Council for the William Roberts, also known as Rick Ross. As you're aware of by now, the appellant plaintiff, Curtis Jackson, is also known as 50 Cent. I want to immediately address, Judge Lovell, your hypothetical in which you just said, would Mr. Jackson have any kind of independent right to take issue with the record label or the copyright holder had Mr. Jackson, had Mr. Roberts gone through the licensing process to do a remix of the Indy Club recording? And his first answer was actually, well, he would have a breach of contract claim. And that's exactly right. The Ninth Circuit's laws versus Sony Music case that Judge Eagleton, who I understand passed away a few months ago, cited too extensively in his summary judgment order. He did reiterate, as in laws, that your true issue is with the record label company, not the defendant. In the laws versus Sony Music case, you saw repeatedly in the Ninth Circuit, they would say Ms. Law's issue with Jennifer Lopez and her sampling with LL Cool J of All I Have, which was the number one song back in the early 2000s. It netted $40 million. And so Ms. Law sued Sony Music for unauthorized use of one of her song recordings. And in that circuit opinion, the judges said your issue is with the record label, not Sony Music. And so the answer to your question is Mr. Jackson's issue is with the record label, not Mr. Roberts. The record label here is basically two record- It was involved in expressive work, not a commercial advertisement though, right? Laws actually sidestepped whether or not First Amendment and the finding of commercial speech was even necessary. Because as you just alluded to as well, Section 301A does not make some unique carve out with respect to only commercial specific uses. Section 301 of the Copyright Act specifically excludes unauthorized uses of reproduced, distributed, copied works that are already registered as copyrights. That is a copyright infringement claim, not a right of publicity claim. And here, Judge Eagleton went through both the subject matter requirement, as well as the general scope requirement in determining whether or not the preemption defense applied in this case. And with respect to the subject matter requirement, there's no dispute in the record evidence that the use of Mr. Roberts' remix was an exact duplicate. It was a copy. It was the In Da Club. If you were to listen to the sound recording of the original In Da Club, which is a registered copyright that is still to this day owned by Shady Aftermath Interscope Records. Shady and Aftermath are two separate but related record label imprint companies. Aftermath in particular is owned by Andre Young, better known as Dr. Dre. He produced the underlying beat of In Da Club. Mr. Yes? Could you just help me out in understanding the case law? Were you able to identify any other case in which a remix uses another person's song as it's done here, as your adversary would have it, to advertise a collateral product? Well, yes. I would submit to you that the Ninth Circuit's Laws case, without question, that was a commercially released album by Jennifer Lopez that netted $40 million, yes. Adversary says that's a different case because you were selling the remix itself. And here, the remix is being used to sell another product, which he says, and we're exploring if he's right or wrong about that, but changes the proper analysis for preemption purposes. So I think it would be extremely difficult, basically based on Appellant's position and your question, for judges to now have to listen to every single song as to whether or not the hip-hop artist or entertainer has made reference to a specific product or service in a remix or mixtape. Bear in mind, the parties don't disagree. It's amply in the record by the party's own deposition transcripts. They agree there is a difference between a mixtape and a commercially released album. It's only because of the wave of the Internet through social media that we even have this issue now. We don't deny Mr. Roberts, through his Twitter account, did post his 26 songs in what he called his Renzel Remixes mixtape album. So there were 26 songs that get downloaded. It is not true, based on my friend Fred here, in terms of what he said, that you're going to automatically see some ad featuring 50 Cent that Mr. Roberts is somehow trying to promote in connection with his next album. Hip-hop artists release mixtapes in between their commercially released albums, because they're trying to stay relevant, as Mr. Roberts said in his testimony. I do this for the culture, I do this for the fans, and the club in particular just happened to be- Yes, ma'am. And it's common in those circumstances in the remix itself to refer to the upcoming commercial album? It's common that products or services will be mentioned, Judge Livingston. And we did have our expert, Bob Cone, testify as well as submit affidavits in an expert report in A-158-224-236-347-402. And then confidentially, CA-511-525, and his actual full initial expert report, which is over 40 pages, is at CA-187. It is common in the hip-hop industry, in mixtapes, in underground tapes, 50 Cent, or Mr. Jackson, admitted to it himself in his deposition testimony. It's not uncommon that you're going to make reference to a product or service. The hip-hop group Run DMC would make reference to Adidas, but they didn't have an official endorsement by Adidas, at least not at that time. It subsequently did lead to an endorsement deal with the two of those entities. But it is definitely understood, and it's not uncommon, that in a remix or mixtape, you may make reference not just to a specific product or service, but you may make reference to someone else's name with or without their permission. Before this circuit in the Southern District of New York, Lindsay Lohan sued Perez and the record label for them making a mere reference to her name in a song. And that court found that it was an artistic expression in the song itself, and that because it was in the entertainment, it was simply- It was actually. That was also a commercially released song. See, that's my point. There are a number of instances. Yes, ma'am. If I understand it, the complaint is that you're using this to promote and urge the purchase of another product, that it will be coming out within a short period of time. And in that sense, it is what you've created is an advertisement for that product. And if I understand the plaintiff, that's what distinguishes this case. So why don't you tell us why you don't think so? Not only do I not think so, but the factual record does not speak to such, because if you actually read all of the lyrics in their entirety, we're talking about an album. This was not a single that was released in which he was trying to sell. Correct. Is what they're saying is the advertisement. Right, and what I'm suggesting is that the claimed advertisement is, number one, it's something that he did throughout nine other songs. There was no particular intent or focus on the plaintiff, per se. And in fact, I believe in the club, remix is like number nine of 26. And you also see other, matter of fact, all of the 26 songs were remixes of original or master recordings that are owned by other copyright holders. So my response to that, Ms. Judge Raggi, is through his own testimony, if he was attempting to actually make a commercial exploitation in the connection of the plaintiff himself in promoting his next album, he would have released it as a single. He would have actually probably done photographs, or he would have spent much more time in making intentional efforts to actually advertise in connection with the use of his next coming album. Adele's name, Grammy award winning artist, one of her tracks, Hello, is featured on the remix. Next thing. How does it replicate or a claim, which is substantially equivalent to a copyright claim, to the use of one's name in such a work? It's part and parcel with a copyright claim. You're asking, in the context. Copyright infringement claim is not against the use of a name. It's against the use of a copyrighted work. That is correct, but in connection with the use of a pre-existing copyrighted recording in this context, we only had two types of right of publicity issues that the plaintiff or appellant claimed. One was the voice, which is not even mentioned actually until the last 19 seconds of the song. And two was the fact that the feature in the track title said in the club featuring 50 Cent. So that particular name component, I would submit to you, as Judge Eagleton said, is part and parcel with the use of the recording itself. The only reason why you're looking at the fact that it says 50 Cent is because it's in connection with the vocal copyrighted sound recording itself. Is it the equivalent of a copyright claim? Yes, which is why he could not sue for copyright. Right, yeah. Copyright claim, when a copyright claim doesn't include any such claim. If you're asking just in the abstract, is a name of talent, athlete, player, entertainer. Could they try to sue for copyright infringement just for the use of one's name? No, that would be a right of publicity claim, I would submit to you. In this context, it is equivalent because Judge Eagleton, not just in the laws case, but this second circuit in the Bayou versus NBC Universal case, which I cite to in our opposition appellee brief. Ms. Bayou was a former professional olympian who claimed that her right of publicity was being infringed upon based on the continuous performances of the Nutcracker, which NBC Sports had continued to air for a number of years, and there the court declined to permit her right of publicity to proceed, holding that it was preempted by the Copyright Act because they found that the performance of her on the copyrighted recording was part and parcel. It was a part of the recording itself, so she didn't have any independent or separate right in that context. So on this remix, instead of just having his featuring Jackson, if instead of that it had had the use of his voice, which is the subject of a copyright, but I had appeared with, Mr. Jackson wants you to know my album is coming out next month, that would be fine, or would that be a right of publicity claim? If he's making specific reference to the album, to the name of the appellant in connection with what he's trying to promote, then I respectfully could foresee and understand that perspective, Your Honor. So your argument is the name is what? It's not, it's de minimis or it's just attributing, it's just an attribution to the use of the sound recording, which is the subject of the copyright, so can't be an independent right of publicity claim? So both, I'm saying both. It is de minimis, it is incidental use, which the circuit has recognized. There are several New York cases that have definitely recognized incidental use. That's even cited in the restatement third torts, which both common law Connecticut follows as well as New York and other states here in the Second Circuit. And he, the opposing counsel himself in the reply brief, they even acknowledge that you can have situations where the right of publicity doesn't apply, including for entertainment, which is what we have here, and that is precisely how the Beyonce Knowles Macariah case was resolved, or in advertising that is incidental to such uses. And our very last argument in our Pelley brief did acknowledge that the judge did not make any ruling at all on the incidental use or the de minimis use exception. And we definitely briefed that extensively in both our summary judgment motion, as well as other briefings in the record. Just so I don't forget to ask you, there's no dispute here that the contract did terminate in 2014? That's not correct. What he is referring to is the term of the contract with respect to the artist's requirement that he has to produce a certain number of albums, songs, or performances. And so I don't know if that was maybe an inadvertent interpretation. I suspect there's probably a survival provision as well that would speak to that. But there is no question, whether it was in 2015 or now, today, in 2020, if someone wants to go through the more traditional method of seeking to obtain permission to use original or master recording of a song, in this particular instance, with respect to this song, there's no question about it. You would go to the record label Shady Aftermath and Interscope, and we briefed extensively the number of citations to the record, in which the appellant himself, from his own deposition, from written discovery and responses to requests for admissions, that he has no independent or separate right to be able to give approval for the Indy Club recording. There are e-mails in the record as well regarding that. Whether or not he believes he has a say, we don't deny that he may have some involvement from time to time, but I ask point blank in his deposition testimony, do you see any contractual right that gives you the ability to approve the Indy Club uses? He said no for licenses. I also said, real quick, I also said, I'm sorry. Do you agree with the proposition that the right given to the recording company, with respect to use of the name for publicity, changed from being exclusive to non-exclusive at the end of 2014? I don't agree with that interpretation, and I don't believe Judge Eagleton did either. I know Judge Eagleton. We don't interpret the contract to be as if somehow his name was separate and apart from the vocal recording itself, such that some independent By a different provision of the contract? The contract speaks to, in Section 7 and Section 8, it does speak to the use of name, image, and likeness of Mr. Jackson. And to your question, I would also add that Mr. Jackson himself never identified or pointed to any specific contractual provision that gave him the ability or right to approve third-party uses of the recordings, and he also acknowledged and admitted that when someone wants to get a remix sampling or recording of an original master recording of his, they're not separately going to him to ask for an independent right of publicity. And this gets into my last point, and then I'll sit down. For public policy reasons, and the law's decision speaks to this, the Ninth Circuit's law's decision speaks to this, for public policy reasons, if we were to accept plaintiff's position, it would definitely create a floodgate of litigation and absolutely turn the clearance process regarding any copyright holders to TV, film, music, or entertainment or the like. And I know you've heard that argument a lot, or that buzz phrase a lot, but just consistent with the record evidence, including our expert, Bob Cohn, if someone wants the rights to be able to use a copyrighted sound recording, they are going to the record label or the copyright holder, and then for the use of the musical composition, they will separately go to the publisher of that song. And in this case, those parties have been identified, and it's fairly consistent in the clearance process or the clearance way. You're not going to still separately then go back to the artist, and there could be multiple artists on the song, and say, oh, by the way, even though I think I already have your approval through your record label or the copyright holder, let me also still try to track down each and every artist that was on a song and get their permission or license for use of their right of publicity. Thank you for your time. I just want to briefly address a couple of factual points that came up at the end of counsel's argument. The first is, we're not asking for a separate licensing process. What we're complaining about is that Mr. Roberts didn't go through the existing licensing process. And if you look at the record evidence specifically, it's cited in a brief, the instances where someone has sought a license to use this song, even in a remix song, what happens is the record label forwards that request to Mr. Jackson and gets his consent. So the existing licensing process incorporates the right of publicity to begin with. I also... Does Mr. Jackson have any ability to use this song with his vocals, authorize its use for publicity without the record company's okay as well? No, the record company is the copyright holder there. So they're the ones who get to authorize the use of that song. But what Mr. Jackson has a property interest in is his right of publicity, which is embodied in the fact that his voice is in that song. He can exercise that right without the record company also giving him approval? To the extent that the right of publicity is somehow in this song and this performance by him, I would think he couldn't act independently, right? I believe that's generally correct, Your Honor. And that's true for any type of copyrighted work. If I take your photograph, I can prevent you from using that photograph. But what I cannot do is take that photograph and make it an advertisement for Coca-Cola or authorize someone else to do that without you also consenting to that commercial use. That's the right of publicity. If that is not the case, there is no right of publicity left anymore because anyone can, against your will, capture your image in some way, either your voice, a sound recording of you or a video and use that in an advertisement. And they're the copyright holder. There's two rights that are at play there. The other factual issue I wanted to... Sure. grant copyrights without Mr. Jackson's permission for artistic use for other things. I'm having trouble understanding what publicity right Mr. Jackson has in this recording that he could exercise independently of the record company. He could not say... He can say to someone, you can use Indy Club in a commercial. That person, though, still needs permission from the copyright holder. If I can briefly... And my question is, is there any right of publicity that Mr. Jackson can independently exercise? In the voice recording? Yes, ma'am. Yes, sir. No. And that's what Professor McCarthy talks about in his treatise, and it's block quoted on page 16 of a reply brief, that if the fact that the copyright holder has those rights doesn't extinguish the right of publicity or make it not Mr. Jackson's. It's that permission is needed from both parties. Okay. I think there was a square disagreement between you and your adversary with respect to whether Jackson in 2015 owned, had any interest in the right to license the use of his name in connection with subjects such publicity. Sure. So to address... You took the position, if I understood correctly, that at the end of 2014, the publisher, the license went from being exclusive to non-exclusive, so that Jackson, after 2014, does possess a right with respect to the use of his name. Is that correct? Correct. And that's... Your adversary says that's wrong. Can you give us substantiation of what you're relying on? Yes. There's deposition testimony at CA367 to CA369 that specifically refers to the fact that this agreement terminated in 2014. So the provisions that only apply during the term of the agreement are not applicable. We made this argument in our opening brief and our reply brief. This is the first time I've ever heard that there might be a dispute about that. Can you point us to the actual provision that substantiates the dispute? So there's just... The only evidence in the record is that the contract never renewed and terminated in 2014. In fact, Mr. Jackson has a contract with a separate record label now. He couldn't have both of these at once. And so... The contract itself specifies that its term is 2014? No. This contract actually... It was renewed several times. There's evidence of that in the deposition testimony. And then it just wasn't renewed again. And in fact, Mr. He testifies. He now has a contract with another agency. So that's the term. The other thing I would say to that, though, is that we're talking about slightly different rights. There's some nuance here. The non-exclusive license, or even if you want to interpret it as an exclusive license, that Mr. Jackson gives to the record label is for marketing phonographic records here under, meaning records that Mr. Jackson produced pursuant to this agreement. Phonograph records under the agreement. What Mr. Roberts advertised is something separate. That's his own commercial album. Mr. Jackson never granted his record label a right to use his right of publicity to advertise Mr. Roberts' albums. I'm a little puzzled about the right of publicity under Connecticut law. Supposing that we have a circumstance in which a choir, a symphony orchestra recording or a choir recording or something like that, is licensed by the copyright holder to some other person, the defendant, the eventual litigation, to play the choir singing some famous song, whatever, or the orchestra. And can any member of the orchestra or the choir then sue the defendant saying, you used my voice, I was one of the choir, my voice is in there, or you used my recognizable playing of my violin in the symphony orchestra in an advertisement and I wasn't paid and I'm entitled to be paid. Is that a valid suit? Is it preempted by the copyright laws? Section 301? The answer to your question is most likely not. Connecticut is a little bit sparse in terms of its case law defining the scope of its publicity right claims. Generally the common law cases about voices, the reasons voices are protected is because they're an indicia of someone's identity. So for example, the Bette Midler case from the Ninth Circuit, Bette Midler has a distinct voice that is associated with her identity. This song, at issue in our case, is quite distinctly known. It's Mr. Jackson's seminal work. Anyone who just hears, a lot of people hear the bass line even associate that. This is a clearer case, but let's say that in my there are solo parts, there are often solo parts in a Bach mass and somebody can make a claim, maybe with some validity, that my voice singing this solo part is recognizable therefore and I didn't get paid. Is that a valid claim? To the extent it's recognizable and that person has some sort of maybe that's embedded in recognizable, but that is someone who's known, you can recognize their voice, then yes, that does implicate their identity and if that piece is used in a commercial advertisement, the claim is not preempted. The person has to be famous to have, for it to be a for it not to be preempted? The person does not need to be famous, but in order to prove one of the elements that the voice is their identity, perhaps there's, perhaps... Suppose the person says, I have six people who will come on and testify, I recognize that to be the voice of Judy Jones. Then that perhaps could be a claim. The scope of Connecticut common law on that is not well developed, but generally the cases that have protected voices have been for celebrities, although the idea behind the right could extend to a non-celebrity as well. There's sort of a dual purpose, it's both to protect against commercial exploitation if you don't want your name to be commercially used and then also to allow you to exploit the commercial value of your name, which is more an issue here in the celebrity context. I know I'm over time. I did want to briefly address counsel's point that there wasn't any sort of commercial focus on Mr. Jackson. If you look at all of the mixtapes in the record, there's lyrics for them. No other mixtape contains a commercial message like this. It's clear that he was singled out even within the Renzel remixes, the other remixes at issue, nor is it the case that an incidental mention of an Adidas shoe or something in a mixtape makes it into a commercial advertisement. I can rap about drinking a Coca-Cola that's on an ad for Coke, but the point where you say buy my album, it's out on December 4th, that is a blatantly commercial message. And that is what distinguishes the use of a sound recording or a photograph or a video for copyright preemption from other sorts of uses. In advertising, the identity of the person itself is put at issue, and that's why for Section 301, the subject of the claim is the persona itself. And if you review Professor Nimmer's analysis on this, I think it's pretty illustrative. It divides the case law literally on whether it's just a song that was sold for its own thing, or in the case of John Facenda out of the Third Circuit, his voice is used in an advertisement. And Professor Nimmer says that distinction perfectly explains how courts in this domain actually rule, because they focus not on whether it was a sound recording or a photograph, but they focus on utilizations. And when they're used in, you know, to advertise a collateral product, that is when you cross the line and the subject of the claim is your identity and the claim is not preempted. So unless there are other questions, thank you, Your Honor.